**IN THE UNITED STATES DISTRICT COUT**
**FOR THE DISTRICT OF ALASKA**

| |
|---|
| CHRISTOPHER J. McINTYRE, |
| Plaintiff, |
| vs. |
| B.P. EXPLORATION & PRODUCTION, INC., et al., |
| Defendants. |

**RECEIVED**

SEP 2 4 2013

CLERK, U,S, DISTRICT
COURT

Case No. 3:13-cv-00149_SLG

## AMENDED COMPLAINT

COMES NOW the plaintiff, CHRISTOPHER J. McINTYRE, pro se, and hereby states, claims, pleads, alleges and complains as his causes of action in the instant matter as follows:

JURISDICTION and PARTIES

1.     At all times relevant hereto, plaintiff Christopher McIntyre, was a resident of the State of Alaska, located within the Third Judicial District.  Plaintiff Christopher McIntyre was the victim of the culpable negligence of the defendants herein insofar as he has suffered economic damages from breach of contract or implied contract and fraud pertaining to his ideas, designs, calculations and invention.

2.     To the best of plaintiff's knowledge, information and belief, at all times relevant hereto, the Defendant, BP EXPLORATION AND PRODUCTION COMPANY, INC. was and is a business entity doing business in and located in the Third Judicial District, State of Alaska and/or doing business in the United States of America and communicated with plaintiff and solicited proposals from plaintiff within the Third Judicial District of Alaska.  By naming said

defendant, plaintiff intends to sue all predecessors and successors in interest of said defendant, all subsidiaries, subdivisions, agents, and/or affiliated companies of said defendant, all holding companies of said defendant, and the predecessor and successors in interest of same for their culpable conduct complained of herein.

3.     To the best of plaintiff's knowledge, information and belief, at all times relevant hereto, the Defendant, BP AMERICA PRODUCTION COMPANY was and is a company doing business in and located in the Third Judicial District, State of Alaska and/or doing business in the United States of America and communicated with plaintiff and solicited proposals from plaintiff within the Third Judicial District of Alaska. By naming said defendant, plaintiff intends to sue all predecessors and successors in interest of said defendant, all subsidiaries, subdivisions, agents, and/or affiliated companies of said defendant, all holding companies of said defendant, and the predecessor and successors in interest of same for their culpable conduct complained of herein.

4.     Defendants, JOHN DOES 1-10, Individually and as Officers, Agents, Directors, and/or Employees and/or Independent Contractors of Defendants were director(s) and/or officer(s), and/or employed by and/or independently contracted by the defendants BP Exploration and Production, Inc. and BP America Production Company and are and/or were individuals doing business in the State of Alaska and/or doing business in the United States of America and were acting in the course and/or scope of their employment and/or agency at the time the plaintiff entered into a contract or implied contract with said defendants. Suit is brought as to said defendants under respondeat superior liability/vicarious liability. John Does 1-10 acted in a negligent and/or willfully reckless and/or willful and wanton manner so as to

breach duties owed to plaintiff in a culpable fashion with reckless and willful disregard of the consequences and which breach was a proximate cause of and/or a substantial factor in causing plaintiff's damages.

5.     Defendants, JOHN DOES 11-20 are corporations and/or business entities and/or partners who are and/or were entities doing business in the State of Alaska and/or doing business in the United States of America and were acting in the course and/or scope of their employment and/or agency at the time the plaintiff entered into a contract or implied contract with said defendants. Suit is brought as to said defendants under respondeat superior liability/vicarious liability. John Does 11-20 acted in a negligent and/or willfully reckless and/or willful and wanton manner so as to breach duties owed to plaintiff in a culpable fashion with reckless and willful disregard of the consequences and which breach was a proximate cause of and/or a substantial factor in causing plaintiff's damages.

6.     It is the intent and purpose of the filing and service of this Complaint to give notice to all culpable defendants, and to preserve plaintiff's right to obtain relief from same, and all named defendants are requested to notify all culpable defendants and parties.

7.     BP Exploration and Production, Inc. and BP America Production Company and their parent and/or subsidiary in interest and/or predecessor and/or successor in interest and/or alter ego of said business entity and JOHN DOES 1-20 are collectively referred to herein as "Defendants."

BACKGROUND FACTS

8.     On or about April 20, 2010, the Macondo oil well located in the Gulf of Mexico exploded, causing the start of the worst oil spill in the history of the United States.

Case 3:13-cv-00149-RRB   Document 22   Filed 10/18/13   Page 3 of 21

9.      Defendants BP Exploration and Production. Inc. and BP America Production
Company were directly in charge of and responsible for the well and the discharge of oil.

10.     On or about May 4, 2010, through July 9, 2010, the defendants named herein,
issued a request for proposals to the public soliciting proposals from them for alternative
response technology to stop the flow of oil or contain the discharge of oil into the Gulf of
Mexico.

11.     On or about May 11, 2010, from his home in the Third Judicial District of Alaska,
plaintiff, Christopher McIntyre, responded to the solicitation for proposals, and in good faith of
implied contract, entrusting the defendants with his own trade secrets, provided a proposal for
the Riser Insertion Tube Tool and by providing his own unique ideas as to the design for the
required mechanical device.

12.     On May 5, 2010, BP's "four-story Containment Domes" method failed to collect
the oil leak. Deutshe Welle is quoted, on May 10, 2010, "BP is calling on clever non-experts to
come up with solutions." Please see exhibit 14. Congressman, John Fleming's, bulletin was
quoted, "Anyone with suggestions or ideas should email or call (281) 366-5511." Please see
exhibit 17. Defendants had run out of their own ideas and solutions.

13.     On May 11, 2010, Plaintiff McIntyre called the BP hotline and asked the
technician on the line if they had considered inserting a pipe into end of broken riser, with
inflatable water well frac packers around pipe to "keep sea water out of equation." The BP
representative on the phone line was impressed by Plaintiff's idea and solicited further
information from him by asking, "What pressure could these packers hold?" Plaintiff responded,
"Up to 30,000 psi." The BP representative asked Plaintiff for his phone number and asked him,

"if they could call back if needed." Plaintiff replied in the affirmative. The BP representative asked Plaintiff to please submit his idea on their website: deepwaterhorizonresponse.com. Plaintiff tried to submit his idea on May 12, 2010, and May 13, 2010, but the form wouldn't allow data entry. Please see exhibit 51.

14.     On May 12, 2010, Plaintiff called the BP hotline and the BP representative on the line asked him for his name and the Plaintiff gave it. The BP representative then said, "Oh good, how can I help?" Plaintiff asked, "I can see graphics and read about three leaks, is that accurate?" Then plaintiff said, "I think you guys are wasting time at the end of broken riser, where are other leaks, and how much riser is left straight on top of BOP, graphics show bends but no leaks." She put Plaintiff McIntyre on hold a few minutes and came back saying, "Looks like there is maybe 10-15 feet straight riser above BOP, riser appears to be leaning 7-10 degrees, with leak in kink above riser and possible leak under BOP but was not sure." Then she asked, "Do you really have something?" Plaintiff said, "Yes." She said she would get short form to me as soon as she could. Plaintiff told her that he had not managed to send last idea yet formally, that he would get that done and start on next idea. She said, "Please do and get it on form so they could see idea." And "Thank you so much."

15.     On May 13, 2010, Plaintiff called the BP Hotline again, gets male technician and asks, "How to enter data on website," Plaintiff was referring to the fact that a date could not be entered on their website. After the BP representative got the name of who he was talking to, his tone changed and he said, "Didn't you already submit?" Plaintiff McIntyre said, "Yes, but I have something new." BP representative asked to put Plaintiff McIntyre on hold and came back to say, "We are no longer authorized to talk to you, we have to see (stressed see) your ideas

submitted." McIntyre asks, "How do I attach drawings?" BP representative replies, "Sorry, just attach as pdf file to form." Plaintiff McIntyre says, "OK." and ends call.

16. On May 14, 2010 at 3:12 a.m., Alaska Time, BP representative, Horizon Support, emailed Plaintiff, "Thanks for your willingness to help. Please complete form attached [form says: your idea, alternative response technology or proposed solution will be reviewed and we will inform you of any further action...]"Please see exhibit 52.

17. On May 14, 2010, at 3:48 a.m., Alaska Time, Plaintiff McIntyre emailed BP representative, Horizon Support, some confidential, pdf files of his own capping tool (further referenced by BP as a capping stack or Top Hat 10) for BOP, believing that the defendants would maintain secrecy of his novel ideas. Plaintiff clearly marked his name and location on the bottom of pdf drawings submitted. Please see exhibit 53, Fig. 11 and 12.

18. On May 15, 2010, at 8:11 a.m., Alaska Time, Plaintiff McIntyre emailed BP representative, Horizon Support, "After viewing current images released to public, ...our earlier communications seem like a waste of time...still wish you success and thanks for the brain exercise." Please see exhibit 54.

19. On May 16, 2010, at 12:45 a.m., Alaska Time, Plaintiff McIntyre emailed BP representative, Horizon Support, giving them suggestions for making riser insertion tube have greater success. Again, Plaintiff believed that the defendants would maintain secrecy of his novel ideas and improvements and that they would inform him if they were able to apply his novel ideas and specific trade secrets to aid in stopping the flow of oil into the Gulf of Mexico. Please see exhibit 55.

20.     On May 17, 2010, at 8:05 a.m., Alaska Time, BP representative, Horizon Support.
emailed Plaintiff, "Thanks…your submission has been reviewed…the team has determined that
your idea cannot be applied."  Please see exhibit 56.  This was a disparaging email for the
Plaintiff to receive from the defendants and/or their representatives.

21.     On May 26, 2010, at 10:40 a.m., Alaska Time, approximately forty (40) minutes
after failed Top Kill procedure started, BP representative, Horizon Support, emailed Plaintiff,
"Dear [this left blank in email], thanks…for proposed solution…(same as 5-17-2010 email
except without Plaintiff McIntyre's name on it)."  "Cannot be applied."  Please see exhibit 57.
Again, the defendants disparage Plaintiff's goods, services, or business by false or misleading
representation of fact.

22.     On May 26, 2010, at 4:42 p.m., Alaska Time, six (6) hours and two (2) minutes
into failed Top Kill procedure, BP representative, Horizon Support, emailed Plaintiff again, this
time using his name, "Dear Chris, thanks so much…for proposed solution…similar approach has
already been considered or planned for possible implementation."  Please see exhibit 58.  Again,
the defendants disparage Plaintiff's goods, services, or business by false or misleading
representation of fact.

23.     On May 28, 2010, at 12:23 a.m., Alaska Time, Plaintiff McIntyre emailed BP
representative, Horizon Support, PDF files (drawings and explanation)…to help implement
McIntyre approach and reduce difficulties.—Cut and Cap procedure.  Please see exhibit 59,
figures 13, 14 and 15.  Plaintiff sincerely believed that his novel ideas and inventions were secret
with defendants and/or their representatives and that his inventions and ideas were a quick and

Case 3:13-cv-00149-RRB   Document 22   Filed 10/18/13   Page 7 of 21

viable solution to the oil spill. Plaintiff clearly marked his name and location on the bottom of pdf drawings submitted to the Defendants.

24. On May 31, 2010, at 4:48 p.m., Alaska Time, Plaintiff McIntyre emailed BP representative, Horizon Support, and made suggestions giving BP other options to implement Plaintiff's trade secrets, then said, "I wish you success…although at this point it is necessary for me to address my family's financial needs…scheduled to start work in remote Alaska, day after tomorrow…" Please see exhibit 60.

25. On June 16, 2010, at 2:32 a.m., Alaska Time, Plaintiff McIntyre, now believing that the defendants may be engaging in conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a competitor in connection with the sale or advertisement of goods or services, emailed BP representative, Horizon Support, a pdf file of his new idea—containment pool and Plaintiff also plainly noted that he also is forwarding the same to other agencies. Please see exhibit 61.

26. On June 19, 2010, Plaintiff McIntyre emailed NOAA—Justin Kenney, saying, "I have ideas that would help BP, but don't know if anyone is seeing them. Please see exhibit 62. Plaintiff forwarded the same files he sent to Defendants. Please see exhibits 53, 59 and 61.

27. On June 27, 2010, at 8:36 p.m., Alaska Time, BP representative, Horizon Support, emailed Plaintiff, "Thanks for submission…your solution has been reviewed, but additional info. is required. Please visit website to send us pertinent info…we can use to further our technical review of your idea…look forward to hearing from you soon." Please see exhibit 63.

28.     On July 6, 2010, at 5:47 p.m., Alaska Time, BP representative, Horizon Support. emailed Plaintiff, "Your submission has been reviewed…a similar approach has already been considered or planned for possible implementation." Please see exhibit 64.

29.     On July 11, 2010, BP removes old bolted-on riser flange and remains of riser stub. Please see exhibits 46 and 48.

30.     On July 11, 2010, Plaintiff McIntyre emails BP representatives at Horizon Support to discuss compensation and to say of his idea, "It will work."

31.     On July 15, 2010, at approximately 2:25 p.m., BP shuts (Top Hat 10), closing last valve. They start a well integrity test next. Macondo Well's flow stopped. It was the first time in 87 days, which no oil flowed into the Gulf of Mexico! The tools used on the Top Hat # 10, used by BP, were substantially the same as the novel, concrete and unique trade secrets disclosed to them by Plaintiff. Please see exhibits 1, 21 and 49.

32.     Two hours later on July 15, 2010, at 4:30 p.m., Alaska Time, Louisiana Business Emergency Operations Center ("LABEOC") emailed Plaintiff to say, "Thank you for your proposal in the Gulf Oil Spill emergency." Please see exhibit 65.

33.     On July 15, 2010, at 4:33 p.m., Alaska Time, LABEOC emailed Plaintiff again and repeated their previous email from 4:30 p.m. that same day. Please see exhibit 66.

I.      **The Riser Insertion Tube Tool with Inflatable Well-Fracking Packers Idea and the Capping Stack or Top Hat 10 Idea**

34.     Plaintiff McIntyre refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

Case 3:13-cv-00149-RRB   Document 22   Filed 10/18/13   Page 9 of 21

## A. **Novel and Original**

**35.** Plaintiff's Breach of Implied-in-Fact Contract-based claim requires only a showing that the disclosed Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea and Capping Stack or Top Hat 10 idea were novel to the Defendants in order to find consideration. A fact-specific inquiry that focuses on the perspective of the Defendants clearly shows that: (a) a relief well was the only source control option mentioned by name in Defendants' Initial Exploration Plan for the area that included the Macondo well; (b) other than the lengthy process (at least 100 days) of drilling a relief well and their "Junk Shot" idea, Defendants had no available, tested technique to control or stop a deepwater blowout in the event of a failure of the blowout preventer ("BOP") to properly function; and (c) Defendants' effort to capture oil from the Macondo Well using other measures was simply a temporary fix to appease the public and show progress toward a viable solution.

**36.** Plaintiff's Unjust Enrichment-based claim requires that the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea be novel and original in absolute terms. This is so because unoriginal, known ideas have no value as property and the law does not protect against the use of that which is free and available to all. Here, Plaintiff McIntyre's Riser Insertion Tube Tool with Inflatable Well-Fracking Packers was a trade secret, his invention, idea, and design information is novel and original in absolute terms based upon: (a) the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea's specificity (the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea was for a very specific application); (b) the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea's non-commonality (Plaintiff McIntyre was the only person who knew of the idea); (c) the Riser Insertion Tube Tool

with Inflatable Well-Fracking Packers idea's uniqueness (this idea is different from any generally known ideas); and (d) the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea's commercial non-availability (the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers idea was never previously used in the oil and gas exploration and production industry).

37.     Defendants used and benefited from Plaintiff McIntyre's Riser Insertion Tube Tool with Inflatable Well-Fracking Packers (trade secret) invention, idea, and design information which was otherwise unknown to either Defendants or the oil and gas exploration and production industry in general. Defendants did decide to use flat, rubber material, in place of the inflatable well-fracking packers; however, all other parts of the tool used, were substantially the same as the industry-specific trade secrets that Plaintiff disclosed to Defendants.

38.     Defendants also used and benefited from Plaintiff McIntyre's Capping Stack or Top Hat 10 invention, idea and design information which was otherwise unknown to either Defendants or the oil and gas exploration and production industry in general. Ultimately, Defendants' use of Plaintiff's Capping Stack or Top Hat 10, stopped the Macondo Well from flowing on July 15, 2010.

**B. Concrete**

39. Concreteness of an idea pertains to the requisite developmental stage of the idea when it is presented. An idea is a protectable property interest, if it is sufficiently developed to be ready for immediate use without additional embellishment. If an idea requires extensive investigation, research, and planning before it is ripe for implementation, it is not concrete. Plaintiff McIntyre's Riser Insertion Tube Tool with Inflatable Well-Fracking Packers invention,

AMENDED COMPLAINT
*McIntyre v. BP Exploration & Production, et al.*

idea, and design as well as McIntyre's (Capping Stack or Top Hat 10) invention, idea and design.
were very specific and sufficiently developed to be ready for immediate use without additional
embellishment by Defendants. Defendants were able to put Plaintiff's (Riser Insertion Tube
Tool) trade secret into practice within three days, and Plaintiff's trade secret (Capping Stack or
Top Hat 10) was put into practice within eight weeks, when normally it would have taken
Defendant years to come up with these solutions and develop them. Please see exhibits 3, 7 and
12, for Riser Insertion Tube Tool and see exhibit 11 (page 31), which refers to Plaintiff's project
involving his Capping Stack or Top Hat 10 idea.

40. Oral presentations and demonstrations of ideas and written proposals of ideas have
been held to be sufficiently developed to be "usable," and thus satisfy the concreteness
requirement. Plaintiff fully explained his Riser Insertion Tube Tool with Inflatable Well-
Fracking Packers idea both orally and via emails, as well as his Capping Stack or Top Hat 10
idea via emails. Please see exhibits 53, 59 and 60.

41. Defendants quote it best in their article titled: "Deepwater Horizon Containment and
Repsonse: Harnessing Capabilities and Lessons Learned," wherein they state, regarding
Plaintiff's Capping Stack or Top Hat 10 project: "Innovations undertaken in CDP: The CDP
Team pursued a range of innovations in planning, mitigating the risks of and implementing a
project that, from inception to deployment, took about eight weeks compared to the normal three
years or more for a similar project." Please see exhibit 11, page 31.

42. Defendants also quote in their article titled: "Near Source Closed Containment,"
that: "In particular, no operator had: engaged at depths of 5,000 feet in shearing and removal of
damaged risers with one-inch thick walls; dismantled and reconstructed closed systems to cap a

wellhead in deepwater; or attempted these containment procedures on a live well." Please see exhibit 11, pages 17 and 18.

**C. Use of the Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10 Ideas by Defendants**

43. Defendants made use of Plaintiff McIntyre's specific novel and original Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10 ideas and designs (McIntyre's trade secrets). Please see exhibits 1, 7, 10, 11, 20, 41, 44, 48 and 52.

ALLEGATIONS

44. From the time period of May 11, 2010, through July 15, 2010, plaintiff exchanged correspondence via email with defendants, and, at the request of defendants, and in good faith of implied contract, he provided industry-specific diagrams, designs, calculations, and other information that would allow defendants to stop the discharge of oil into the Gulf of Mexico.

45. The ideas, diagrams, designs, calculations, and other trade secret information provided by Plaintiff to Defendants, were unique, and constituted his own intellectual property and his own invention.

46. Defendants stopped communications with plaintiff on or about July 15, 2010.

47. Defendants used plaintiff's ideas and designs to create a device that successfully stopped the free discharge of oil into the Gulf of Mexico on or about July 15, 2010. Plaintiff's inventions and ideas were acquired by Defendants under circumstances giving rise to a duty to maintain its secrecy or limit its use; or before a material change of the person's position, knew or

Case 3:13-cv-00149-RRB   Document 22   Filed 10/18/13   Page 13 of 21

had reason to know that it was a trade secret and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

48.     Defendants have not paid anything to plaintiff for the use of his ideas and designs.

49.     Defendants have not given any credit or recognition to plaintiff for the use of his ideas and designs and they effectively misappropriated his trade secret for their own use in the highly-lucrative oil business.

50.     The ideas, designs, calculations, and invention of plaintiff were of immense monetary value in allowing Defendants to stop the flow of oil into the Gulf of Mexico.

51.     Defendants have now shared plaintiff's trade secrets, ideas, designs, calculations and invention with other oilfield companies and said inventions and intellectual property of plaintiff is now being implemented and used throughout the oil industry. Defendants' actions amounted to espionage, or the use of spies by a corporation, or the like, to acquire the plans or technical knowledge of a competitor.

52.     Defendants' acts or omissions are a breach of contract or implied contract, and are actionable

## COUNT I
## BREACH OF CONTRACT or of IMPLIED CONTRACT

53.     Plaintiff hereby realleges and incorporates by reference all the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

54.     On or about May 11, 2010, a contract or an implied contract was entered into between plaintiff and defendants, whereby plaintiff provided his ideas, designs, calculations and invention ("proposals") to defendants, and if the proposals of plaintiff were to be utilized,

Case 3:13-cv-00149-RRB  Document 22  Filed 10/18/13  Page 14 of 21

defendants in turn were to pay plaintiff an appropriate and reasonable amount commensurate with the benefit they provided to defendants.

55.     On or about May 11, 2010, a contract or implied contract was entered into between plaintiff and defendants, whereby plaintiff provided his trade secrets, ideas, designs, calculations and invention ("proposals") to defendants, and in exchange, defendants were to keep the information in a confidential manner so as not to share said information with other entities in the oil industry.

56.     Defendants breached the contract or implied contract with plaintiff by utilizing his proposals without paying anything to Plaintiff for their use.

57.     Defendants breached the contract or implied contract with Plaintiff by sharing Plaintiff's trade secret proposals with other entities in the oil industry.

58.     Violation of other duties and/or culpable acts and/or omissions will be revealed through discovery and this Complaint will be amended accordingly.

59.     As a direct and proximate result of the breach of the contract and/or implied contract by defendants, and each of them, caused substantial financial and economic harm to plaintiff, in an amount in excess of $1,000,000.00 (one million dollars) and plaintiff is entitled to an award against each of defendants jointly and severally for all actual compensatory damages and for an award of punitive damages as pled herein as to each of the defendants in an appropriate amount.

<u>COUNT II</u>
UNJUST ENRICHMENT

60. Plaintiff hereby realleges and incorporates by reference all the allegations contained above.

61.  Plaintiff McIntyre conferred the benefit of the use of his novel, unique, and concrete Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10 trade secrets, inventions, ideas, and designs upon Defendants.

62.  Defendants, both directly and indirectly, requested the use of Plaintiff McIntyre's Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10 invention, ideas, and designs, and the ongoing engineering services of Plaintiff McIntyre, and have knowingly and voluntarily accepted their benefits.

63.  Defendants were unjustly enriched by appreciating the use of Plaintiff McIntyre's novel, unique, and concrete Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10, trade secrets, invention, idea, and design.  Defendants' unjust enrichment includes, but is not limited to, the fact that the misappropriation of Plaintiff's trade secrets, by Defendants, of Plaintiff McIntyre's novel, unique, and concrete Riser Insertion Tube Tool with Inflatable Well-Fracking Packers and Capping Stack or Top Hat 10, inventions, ideas, and designs have saved Defendants an extensive amount of money by limiting:  (a) Defendants' liability, as a responsible party under OPA, for the removal costs and damages that resulted from the Deepwater Horizon oil spill incident; and (b) the civil penalty under CWA that resulted from the Deepwater Horizon oil spill incident.

## COUNT III
### DEFENDANTS' VIOLATION OF AS 45.50.940
### ALASKA UNIFORM TRADE SECRETS ACT

64. Plaintiff hereby realleges and incorporates by reference all the allegations contained above.

65. Defendants violated the provisions of Alaska's Uniform Trade Secrets Act

and acquired Plaintiff's trade secrets by:

'(1) "improper means" includes theft, bribery, misrepresentation, breach or
inducement of a breach of a duty to maintain secrecy, or espionage through
electronic or other means; (2) "misappropriation" means (A) acquisition of a trade
secret of another by a person who knows or has reason to know that the trade
secret was acquired by improper means; or (B) disclosure or use of a trade secret
of another without express or implied consent by a person who (i) used improper
means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or
use, knew or had reason to know that knowledge of the trade secret was derived
from or through a person who had utilized improper means to acquire it or who
owed a duty to the person seeking relief to maintain its secrecy or limit its use, or
was acquired under circumstances giving rise to a duty to maintain its secrecy or
limit its use; or (iii) before a material change of the person's position, knew or had
reason to know that it was a trade secret and that knowledge of it had been
acquired by accident or mistake; (3) "trade secret" means information that (A)
derives independent economic value, actual or potential, from not being generally
known to, and not being readily ascertainable by proper means by, other persons
who can obtain economic value from its disclosure or use; and (B) is the subject
of efforts that are reasonable under the circumstances to maintain its secrecy.'
(AS 45.50.940).

66. Defendants owed a duty to the plaintiff to maintain secrecy of his ideas and

inventions and to limit their use until further notice from the Plaintiff.

67. Defendants breached their duty to the plaintiff to maintain secrecy of his ideas and

inventions and to limit their use until further notice from the Plaintiff.

68. Plaintiff incurred damages from the actual loss caused by Defendants'

misappropriation of his trade secret.

69. Defendants are liable to Plaintiff for the damages incurred by him as a result of their

negligence for each provision of the statute herein named, whether collectively or individually.

70. Plaintiff is entitled to injunctive relief, pursuant to 45.50.910:

"(a) A court may enjoin actual or threatened misappropriation of trade
secrets. Upon application to the court, an injunction shall be terminated when the
trade secret has ceased to exist, but the injunction may be continued for an
additional reasonable period of time in order to eliminate commercial advantage
that otherwise would be derived from the misappropriation;

(b) If the court determines that it would be unreasonable to prohibit future
use of a trade secret, an injunction may condition future use upon payment of a
reasonable royalty for no longer than the period of time the use could have been
prohibited.

(c) In appropriate circumstances, affirmative acts to protect a trade secret
may be compelled by court order."

71. Pursuant to AS 45.50.915(a), Plaintiff "also may recover for the unjust enrichment

caused by misappropriation that is not taken into account in computing damages for actual loss."

72.  Pursuant to AS 45.50.915 (b), "If wilful and malicious misappropriation exists, the

court may award exemplary damages in an amount not exceeding twice the damages."

## COUNT IV
### § 45.50.471. UNLAWFUL ACTS AND PRACTICES

73.  Plaintiff hereby realleges and incorporates by reference all the allegations

contained above.

74. Defendants committed Negligence *per se* with their actions and/or inactions which

violated AS 45.50.471(a), "Unfair methods of competition and unfair or deceptive acts or

practices in the conduct of trade or commerce…"

75.  In further violation of AS 45.50.471(b)(1-4, 7, 11, 12 & 14), Defendants committed,

against the Plaintiff and the laws of the State of Alaska:

'The terms "unfair methods of competition" and "unfair or deceptive acts or
practices" include, but are not limited to, the following acts:  (1) fraudulently
conveying or transferring goods or services by representing them to be those of
another; (2) falsely representing or designating the geographic origin of goods or
services; (3) causing a likelihood of confusion or misunderstanding as to the
source, sponsorship, or approval, or another person's affiliation, connection, or

association with or certification of goods or services; (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits. or quantities that they do not have or that a person has a sponsorship, approval. status, affiliation, or connection that the person does not have; (7) disparaging the goods, services, or business of another by false or misleading representation of fact; (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods or services; (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged; (14) representing that an agreement confers or involves rights, remedies, or obligations which it does not confer or involve, or which are prohibited by law;

76. Defendants' negligence per se caused damages to the Plaintiff and is actionable.

77. Defendants are liable for damages caused to the Plaintiff for their unlawful acts and practices.

78. Defendants are liable for each and every provision herein named, whether individually or collectively.

## COUNT V
## FRAUD AND PUNITIVE DAMAGES

79.     Plaintiff hereby realleges and incorporates by reference all the allegations contained above.

80.     At various times prior to July 15, 2010, Defendants informed Plaintiff that they would not be able to utilize Plaintiff's proposals and effectively disparaged the goods, services, or business of Plaintiff by false or misleading representation of fact.

81.     After telling plaintiff that they would not be able to use his proposals, defendants then proceeded to use the proposals, and with said proposals, succeeded in stopping the oil spill.

82.     Defendants, using deceptive acts or practices in the conduct of trade or commerce, claimed plaintiff's proposals as their own (misappropriated his ideas), and hid the fact that it was Plaintiff's proposal that successfully stopped the oil spill.

83.     Defendants' wrongful conduct was done with the intent to deceive Plaintiff and to avoid paying Plaintiff for his proposals and to take credit for the proposals within the industry and before government officials.

84.     The wrongful and fraudulent actions of Defendants deprived Plaintiff of substantial payments, and additional sales within the oil industry, causing him damage in an amount in excess of $1,000,000.00 (one million dollars).

85.     Defendants acted intentionally and/or recklessly with extreme disregard for the welfare of Plaintiff.

86.     Upon a finding that Defendants and each of them acted intentionally and/or recklessly in connection with the proposals and trade secrets of Plaintiff, Defendants, and each of them, should be held liable for all damages they have caused to Plaintiff and for punitive damages, with due regard for the net worth of the Defendants, the economic benefit from the activity, the culpable nature of the conduct, the potential and actual consequences, and the applicable provisions of the law, in an amount to be determined by the trier of fact.

## COUNT VI
## COMMON LAW AND STATUTORY CAUSES OF ACTION

87.     Plaintiff hereby realleges and incorporates by reference all the allegations contained above and further alleges as follows:

88.     It is the intent of the Plaintiff, by filing this complaint, to assert and preserve all applicable causes of action at common law, or under the statutes of the State of Alaska, against

Case 3:13-cv-00149-RRB   Document 22   Filed 10/18/13   Page 20 of 21

all culpable parties and defendants, arising from the facts and circumstances set out in this complaint, and to preserve his rights in light of any applicable statute of limitations and to give notice to all such culpable parties, and if need be, an amended complaint, or amended complaints, will be filed with due diligence to effectuate same.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment of relief against Defendants, and each of them, as follows:

1) For monetary damages, the exact amount to be proven at trial;

2) For special damages according to proof at trial;

3) In the event that the jury concludes that any defendant is guilty of fraud and/or having acted intentionally and/or with reckless indifference to the rights of plaintiff, for an award of punitive damages in accordance with proof at trial;

4) For costs, interest, and attorney's fees; and

5) For such other further relief as the Court may deem equitable and just.

DATED this 24th day of September, 2013, in Eagle River. Alaska.

Christopher McIntyre, Plaintiff
*Pro se* litigant
19978 Tulwar Drive
Chugiak, AK 99567
(907) 688-0181